Case number 22-5170 Andres F. Cabezas, appellant, v. Federal Bureau of Investigation. Mr. Horwitz for the appellant, Mr. Walker for the appellate. May it please the court, I'm Brian Horwitz for the appellant. We're here today with respect to an appeal of lower court's ruling on cross motions for summary judgment, as well as its unexplained denial of appellant's unopposed motions for discovery and in-camera review. Our position is that the court below erred by issuing orders with respect to our motions without providing explanation, specifically the motions for in-camera review and for discovery. And by failing to address all of our non-frivolous arguments in our motion for summary judgment, and contrary to the other sides, the FBI's motion for summary judgment, and by reaching impermissible factual conclusions in its order. This court has the power to remand this matter back to the district court for full review and determination on each of those motions so that a full record can be established and our client can have a chance to get all of the documents that would be responsive. I can go, so the court will start with the first one, the motions for discovery and camera review, the court issued an order that did not contain any explanations about why it was denying them. And in U.S. v. Gaskins, as we cite in our briefs, when a court vested with discretion makes a decision that is neither self-explanatory nor supported with any reasoning, it should be vacated and remanded for explanation rather than having the court of appeals guess as to its grounds. The discovery and in-camera are available, but they're not routinely engaged in. In fact, quite the opposite. In FOIA cases, they're very rare. And so I guess the question is, when the declarations that the government has submitted satisfy the district court that segregation is adequate, that the documents have been adequately reviewed and defined, that the exemptions are appropriate, it's typical in those cases that there is not discovery and that there's not in-camera review. And so given the nature of Judge Nichols' ruling on the merits, is that not sufficient support for his exercise of discretion on those two extraordinary procedural steps? I mean, I suppose that's the FBI's position. If we're looking at this, we're alleging misconduct. We see that there are documents that haven't been produced. We see in the FBI's production and redaction, I should say, of documents, there are redactions that are clearly erroneous. But those are things that are teed up for you to challenge without discovery or in-camera review. I mean, you're articulating the points here. And so those ordinarily are reviewed on appeal without and reviewed by the district court without in-camera review. Well, I mean, the primary thing that we wanted with the in-camera review was this arrest report. And I think we cited case law. I know we cited case law specifically in our brief and our reply brief addressing the fact that in-camera review can be a tool used by the district court in that situation. And in this situation, specifically here, the FBI basically did not produce the entire arrest report on a couple of exemptions. I think it was 7E and 5. We got a lot of arguments back and forth and a lot of briefing about both of those. But ideally, from our perspective, the district court was in the best position. We were saying that those exemptions didn't make sense, especially given that some of these documents had already been released, and especially given the nature of the document. We talked about the fact-based versus attorney communications. And it would have just been very easy and appropriate for the district court to say, okay, let me look at this. As a former district court judge, I would say that I would push back that it's just very easy and appropriate to have in-camera review every time a lawyer asks for it. That's the whole reason we have these rules in FOIA cases where we have the whole Vaughn index procedure in the first place. So you don't have to do that because there's a bazillion of these cases in the district court. And we don't have the time to do in-camera review, and it should be reserved for instances where you really can't discern the merits of the arguments based on the papers that are filed. So why couldn't a district court make an intelligent and informed decision based on what was filed? I mean, I guess we go back to the fact that we had provided factual reasons for attacking various of the other documents and various of the other exemptions, and the district court didn't really adopt or accept or even utilize those attacks in any of its decisions. Here we had a 15-page document that, as far as we know, contains potentially factual things and other things that had already been released, and we disagreed with the exemption. But it was a limited motion for in-camera review, and it was a 15-page report. You're talking about now you're raising a 7E, what you think is an inappropriate application of 7E to this arrest plan? Is that what you're talking about? Yes. And these two, I should say that— The presence of—the theoretical presence there of factual information, no doubt there's factual information in that plan. The government has said that is—the way that it's organized and teed up and discussed and identified is going to reveal law enforcement techniques. And you're able, without in-camera review, to argue about that. But I have a prior question, which is I don't think you referred to 7E at all in your opening brief. And in this court, if you don't raise an argument in your opening brief, that argument is forfeit. And I did not understand you to be challenging the FBI's invocation of Exemption 7E. Am I wrong? We actually had challenged it in the court below. That's true, but we're a new court. We don't go back and reread your district court briefs. And we do sometimes, but it's not how we frame what we think brought to us. Understood. And the way I saw it is your honor is correct. We didn't—as far as I can recall. I don't recall if we put that 7E in the opening brief, but it was something we were replying to because the government, the FBI raised it in their opposition. So it was within the scope of something we could address once it was raised in the opposition. Well, our circuit rules require the appellant to raise the issue. And, I mean, a lot of your briefing is taking issue with what the district judge did, but we're here on de novo review. So we're not really here to reexamine and flyspec the way the district court did things. And I understand that one thing that you're asking for is something that could only be done in the district court, which is the discovery—I mean, we could do in camera review here, but we typically don't. But setting that aside, we're here listening to you on de novo review. So you should make on the merits any arguments that you have. Your concern about the arrest plan, I've heard. What about the—you make a—in the district court, anyway, argued about the screenshots versus the text of the interaction between the defendant and the putative minor. That information is available. The information that wasn't provided is not the exact same. It's a different format. I'm not sure that that's really simple under the public records or, you know, public domain exception. I mean, I suppose, and this goes back to the discovery motion itself, the concern that my client had that we had was that there were discrepancies. There were, you know, it looked like postdated records. We talked about the misrep—the allegations of mishandling of documents and the fact that the FBI actually, in their original production, produced something, and then only after we filed litigation did they actually go. In the brief, they talk about, oh, we went and found these things in Tampa, but that was only after the litigation was filed. There were four total productions of documents, and I believe those were all—three of those at least were after the litigation was filed. So it has been our position the whole time that the FBI was holding back on documents and misapplying exemptions. So you need to walk us through this, at least for me. You've talked about misconduct. You've talked about postdating. I'm not really following your theory here. What you think happened and what the support for that is. Well, what we think happened, among a couple things, is—before that, what we want is to be able to just say we've gotten a full production from the FBI of all the documents that have been requested. What we think happened was that there was agent misconduct and that the evidence of that agent misconduct has been withheld or obfuscated or kept outside of the required CRS system where those documents should have been kept. All right. So some documents were produced from—what is it called?—the satellite office. The field office. The Orlando—yeah. And you're arguing in part about the adequacy of the search. And the argument there, to me, actually—I'm going to have to ask the government—they don't explain why the person who they asked to do the search did it, why other people weren't asked to search, what they were searching, what terms they were using to search. So there's some real questions there about the adequacy of the search. But putting that aside, you imply—or correct me if I'm wrong—that the fact that the documents kind of trickled out is itself an indicium of wrongdoing. But in our experience in FOIA cases, we do not read misconduct from the fact that some documents come later. People are digging for stuff. When they find it, they produce it. But I take you to have some other basis for your misconduct allegations? The misconduct isn't necessarily the trickle of documents out. The misconduct is that the records were kept outside of the system that they were supposed to be kept inside of intentionally or otherwise. So your remedy for that is to explain why the search was too narrow and ask for broader, as you did effectively with getting the documents that were outside the CRS system. And your further argument about that is? It's hard to confirm that all of the documents that were outside of the CRS system have been produced. We understand that is the general argument. But the problem is, give us some specifics. And what about the fact that there—you argued about there were some e-mails? Thank you, Your Honor. I mean, that's a clear example, right? We produced an expert affidavit saying that because of the way that this investigation was—or action was conducted, there necessarily have to be other e-mails in existence and records in existence related to interactions with Craigslist. The government never responded to that. The court didn't address it at all. Wait, I think there was a response to that. Go ahead. But your—the FOIA requests were for documents related to Mr. Cabezas. And so what your expert said is that, yes, there would have been some e-mails about—just basically from Craigslist about, like, setting up and creating the e-mail account. But those e-mails wouldn't have been related to Mr. Cabezas. They were just related to setting up the e-mail account generally. So they're not even responsive. I don't know that they were only just that. I think he—Mr. Demetrius also indicated that there would be correspondence back and forth while the e-mails were anonymized that would be through Craigslist that were not produced, whether or not they— What about Judge Wilkins' point about how is your client directly affected? I mean, he's entitled to request all documents related to anything he asks for as long as it's not— And what did he ask for specifically in this respect? You know, I don't actually have—this is silly, of course. No, it's not silly. We're trying to— No, no, no. Your request is not silly. I'm sorry. And one question I had— Sure. —was that you did have some expert testimony about Craigslist and how it functions. And yet, though you were asking for this type of document, you never got it. And your argument, I thought, was that they didn't look in the right place. Am I wrong about that? That's one of the arguments is that— Well, we only need one at a time, okay? Sure. And maybe you want to stick with your strongest one, given Judge Pillard's point about what our standard of review is in these cases. So I'm looking at one of the arguments that may be persuasive. So I want to get you to make the strongest argument you can as to why you think the district court heard and why this case ought to go back on the adequacy of the search as to that—those emails. Sure. And this goes back to the assertion that we have and the evidence that we produced showing that the records, or at least some of these interactions, were done on a T-Mobile cell phone that was not FBI property. It had an attributable IP address. And the fact is the record search doesn't seem to have addressed those other offline, outside of resources that were improperly used by these agents in their investigation. And that is the point. We can't get to those records because they held them away. And the FBI either doesn't have ability to say after the fact when those records haven't been properly put into the FBI system, hey, here's the records, because they don't have them in their possession, even though they should. And the FBI agents themselves are required to submit everything that they accessed to that system. My indication is that the FOIA requested any and all records under my name and or identifier assigned to my name. And then it listed the types of records that he was listed to, that he wanted. So the FOIA request was specifically linked to records under Mr. Cabezas' name. And so that's why when I look at the declaration of Mr. Dimitrelos, that's your expert, right? Yes. Okay. I look at that declaration and the first 17 paragraphs basically establish his background, experience, expertise. The money paragraph for our purposes is the final one, paragraph 18. Yes. And he says, okay, here's how craigslist.org email system works. And he says in that final sentence, the posting individual receives emails from Craigslist relating to the initial posting of the advertisement, management of the advertisement, and forwarded communications from people responding to the advertisement. Now, all of that is referring to what the agent would have received, right? Not what Mr. Cabezas would have received. Am I correct about that? Those are things the agent would have received because these are on the agent side of the use of Craigslist. But that doesn't mean that they wouldn't refer to or mention Mr. Cabezas. Well, I don't see anything in paragraph 18 that tells me that any of those sorts of emails that is being referred to are necessarily going to refer to Mr. Cabezas by name. I mean, my overall point here is that in these FOIA cases, we have said the court doesn't have to oversee a search that results in finding every document imaginable that might be responsible. The court has to oversee a reasonable search. And to the extent that you say that the search isn't reasonable and they should have looked elsewhere, you can't just say that. You have to give the court some reason to believe that there might be something elsewhere. And you have to identify what the elsewhere is. You have to say this is the other place that we think needs to be searched that hasn't been searched because the court can't just order the FBI to search everywhere else outside the CRS system. And what the court did here was it got a declaration that said, okay, we reached out to the officer, the agent that had custody and control and management of the case file. And we asked that person, is there anything else related to Mr. Cabezas that didn't make it into the CRS system and they found some things and those things have been turned over or have been withheld and appear on the Vaughn declaration? What else is the court supposed to do at that point? We raised the two places that potentially could have other records that we think have other records. Those would be, and we talked about it, we provided evidence regarding the T-Mobile phone. And we also talked about agent hires prior. Wait, what are the two other places? T-Mobile phone and whatever personal computer of the agents here. So we talked about, and I'll get there in a second, but the idea was we presented evidence that one of these agents had been previously reprimanded for conducting this kind of operation from a personal computer as opposed to an FBI computer. It's our position that that's what happened again here. And so there are records in that place that haven't made it. And then if the agent that's being asked, hey, do you have any more records, has a disincentive to provide things that are on their personal computer because that's how they already got in trouble or their partner already got in trouble, they're not going to produce those documents. What's the basis for inferring that an agent may have used their personal computer in the investigation of Mr. Cabezas? Two bases. One is that IP address with the T-Mobile phone. That's a phone, not the computer, right? Correct. You're right. You're right. But that's an outside source that's not FBI that we don't have any records about. Wait, you are assuming some things that aren't apparent, at least to me. Okay. I mean, does the FBI never use T-Mobile phones in undercover operations? This gets a little bit more technical than I'm really prepared to discuss, but there's an attributable versus unattributable IP address issue here that at least my understanding is if it had been coming from a government phone or a government device, the IP address wouldn't show up the same way it did with respect to this T-Mobile. But you don't think the government would use a phone that doesn't appear to be a government phone when it's doing undercover? Either way, if they did or didn't, then the original record should have been submitted. But it's my understanding that the government agents aren't supposed to use nongovernment devices. Well, I'm saying this could be a government device, but it could be not through government IP address because it's part of an undercover. And the other thing is, I thought they provided all of the mobile phone. I mean, the prosecution was based on or the charge was based on the mobile phone transcript. So I think that's a different phone that you're thinking of. That's my client's phone. So I believe that was the transcript taken from that particular device. Well, if it's from the client's phone, then why would – so you want the agent's phone to cross-check the accuracy of the transcripts from your client's phone? We have a couple of records and we cited to them in our briefs where it looks like things have been backdated or it looks like things are missing. And so, yeah, that would be ideal. Or at least, like I said, going back to the – Those arguments went over my head. I did not, in reading your brief, what I thought was carefully, I did not follow your points about backdating or deleting. Can you just tell us what you're referring to? Yes. Hold on one second. I'll pull up the actual page numbers so I don't have to speak in ambiguities. Apologize. So the backdating records, there was a footnote, and we're referring to JA-514 versus JA-603. And there was a slight discussion about, you know, at one point there was a discussion of Mr. Cabasis being on this printout that the FBI did provide in their FOIA production. One version of it says prior to the arrest, prior to meeting him, that he was dangerous and one did not. And it was unclear why there was a distinction. The only thing that made sense was that someone had gone back and added that for some reason and backdated it. So the argument in your brief that is linking to this is where? Just so that we have it as a reference? Yeah, it's – hold on one second. I think that might be it. You referred to a footnote? I think it's a footnote in the reply brief. But it's also, I believe – oh, no. Page 15, footnote 7 of our reply brief. It's mentioned. I believe it might also be – I believe it's also mentioned in the underlying brief. But it's definitely mentioned there, and it's in the record. So where in your opening brief do you say that the district court erred because it did not also order the FBI to search T-Mobile phones or personal computers of agents? I guess we didn't say it explicitly that way. We talked about the misconduct and the fact that it was our belief that these records should have been reviewed in some way or shape or another. But I don't know that it was explicitly stated as succinctly as you just put it, Your Honor. Well, the question is, was the district court on notice of what your argument was? And you're acknowledging no. These were the bases for the motion for summary judgment, the opposition for the motion for summary judgment. No, I understand you made the broad arguments. All right. So now you're asking us to reverse for failure to do something very specific. But you never alerted the district court. That's what I hear you responding to Judge Wilkins' colloquy. I think we raised these in our motion to amend. I think all these specific issues were raised multiple times in the court below. Judge Wilkins, at least as I was responding to, was talking about where it was in our initial brief in front of this court. No question about it. OK, it's not enough to say the district court erred. Why? Say that again. And I thought that's what Judge Pillard was asking you about in terms of changing of what the email said and things like that, telephone. What's your other strong argument? I mean, I think we go to the other side of this, is that various misconduct allegations, the FBI did not. We specified some misconduct allegations. We talked about a few of them here now. The FBI didn't really address them other than to say in their brief in the court below that we hadn't specified anything. We demonstrated to court a couple of different times that we had specified what we thought was alleged misconduct, at least as detailed as we could based on the information we had. For example? The the iPhone. I mean, the Verizon phone. The but the other big one that was I think we haven't even talked about today is this. The records pertaining to and and the and the actions around the agents attempted return of what was evidenced. This iPhone, Mr. to Mr. in prison while the appeal was still ongoing. That was another allegation of misconduct that we cited to as a reason for why other records and should be unexempted or why we had a right to see them. So. So, yeah, explain to me. That sounds. Peculiar that when there was an appeal going on, that something that was evidence. Now, presumably, I mean, I gather one of the things that you say the government is wrongly withholding is the screenshots that it has kept somewhere of that phone. But what flows in your mind or what could flow? And I understand this is why you wanted more discovery or discovery. But the goof. Why? Why is it insidious? What is it trying to do or revealing that is prejudicial to Mr. Cabezas is FOIA entitlement. Give it the attempted giving back of the phone. It's like, OK, it's not taking care of evidence. That phone is apparently no longer evidence because it seems to be wiped of stuff. But I don't know that it is wiped of stuff. Your honor. But when the brother was looking at it, things weren't showing up. That's true. He said that some things were not in there. The phone is an interesting kind of. Mess. Right. It's a digital record that we have not been able to access. He I've it. It was tried. They tried to give it back. While it shouldn't have been given back. We would love to have seen it and see it and give it to our expert to analyze it for various purposes, because we think that there's records on there that would be beneficial to my client. We can't get we either can't get the phone or we can't get the phone in the wrong way. So the way it was that the agents tried to give it back was indicative of. I don't know what negligence or insidious intent to cause my client to be committing a further crime while in prison receiving this this device, which the FBI. That's not before us. So, so they mishandled it. What record or information that your client wants? Has he been prevented from getting. I mean, I, I suppose that the contents of the phone are especially the communications that are on there versus the screenshots that have been submitted would be demonstrative of any differences or misconduct. But if that's what's your authority that. Screenshots are not under for you are not a. Permissible substitute for the actual raw data. That, that, that, that. If there's a bunch of emails that the government can't turn over. Right now, so the emails the government has to give you the emails in electronic format. Is there any case way case that's ever held that that that's what has to have. I haven't briefed that particular issue, so I don't have that at my fingertips. Just stepping back and thinking about the, you know, the FBI did this search of the Tampa field office and located the 2 materials. That you had identified as missing the phone recordings and the photos of the rest scene. Are there other responsive materials that you suspect are missing from the Bureau's production that leads you to conclude that still that search. Isn't adequate. Well, I mean, I think the, the. Prime example, it's hard to guess what's not there, but the prime example would be the records and your honors have have addressed this already, but the records pertaining to the Craigslist advertisements and correspondence. That permeated that that system. Those would be records that we would think would exist. We're fairly certain that they exist, but we haven't seen. Anything else off the top of my head. I, I don't know. How about the, the, you've pointed to these dates numbers 160 and 226 saying that the FBI wrongfully redacted basis is name from those. And then you point to, I think, it's number 91. To say those documents refer to the basis, but the documents at 160. And 226 have a different case number. From from the. 91 documents, so it seems like it maybe wasn't basis. Do you have any response to that? Without having anyone ever seen this on redacted document, I, I, I don't know who it would refer to it. It does. There's no other individuals that were indicted or, or related to this indictment as far as I, I'm aware in the criminal investigation. And, I mean, going to page 160, I believe your honor just refer to that. The name basis is Andres basis is listed on there a couple of times. So, where are you saying it was wrongfully redacted. But, well, so that's an, that was an example of a wrongful redaction. Right. I mean, to the extent that it says to document the indictment of redacted. Who else could it be if it is someone else that would be an explanation that would come from the FBI, but I don't understand how that would make any sense. Why, why would this, this indictment memo or communication refer to indictment of someone else when it's all about Andres basis. Just questioning whether it would be someone else because it's, it has a different case number, but you don't have any explanation for that. I can't imagine an explanation for that. I don't understand. I can't imagine a factual situation. I mean, short of a typographical error, either in the name, which is repeated multiple times and specific date. Right. The description, the details does pertain to every, every component of it does. So, I don't understand. I can't comprehend what other name would be under the synopsis paragraph when everything in the details below refers to basis. And the going back to your arguments about exemption seven C and 70 you argue that there there's information should have been segregated and released. But you're not you're not arguing that the documents themselves are not records or information compiled for law enforcement purposes. You're just arguing about the breadth of what that covers in the right. They blocked the whole 15 pages or however many pages it was. It's completely not produced. So, yeah, I would think that some of the information, especially the extent as we talked about before has already been produced or has been is no longer part of an ongoing investigation can be produced. So, yes, it could be segregated or redacted. Any further questions? Judge Wilkins, Judge Rogers. Mr. Horowitz, did you reserve any time for rebuttal? I reserved two minutes. All right. We'll give you two minutes. Thank you. Mr. Walker for the United States. Good morning. May it please the court. Johnny Walker representing the FBI. Your honors. I think what the declarations and our briefs in this case describe is a very routine for your request to the FBI by the subject of an FBI investigation for all records under that individual's name or any number identified with that individual's name. In response to that request, the FBI undertook a search of the indexing system that it uses to index investigative files that are indexed to a person's name, located the file with records under Mr. Cabezas' name, and processed everything in there for release. Exemptions applied. Everything in this case is covered by a law enforcement exemption. This is the kind that you would expect to apply to records in a law enforcement investigation file. There are some underlying subsumed exemption five and exemption six withholdings as well. But everything here is covered by the type of law enforcement exemptions you would expect to see in a case like this. Now, this investigation was conducted out of the Orlando Maitland. I believe it was the Tampa field office that was contacted about additional information from Mr. Cabezas. Well, that's why I'm asking. The investigation was conducted out of Orlando Maitland or out of Tampa. I know that what the declarations indicate is that the special agent who was responsible for Mr. Cabezas' file was in Tampa. That was the individual contacted for the sort of targeted retrieval of the additional records. And why was it targeted? I mean, so they just went and asked him for the things that Mr. Horowitz had identified? Yes, that's correct, Your Honor. So the initial search that was conducted by the FBI was, I think, clearly reasonable in relation to the request. As for documents and records under Mr. Cabezas' name, the place where the FBI stores those files is in its central record system, which is indexed to individual's name. And it located the file containing records under Mr. Cabezas' name. During the course of litigation, Mr. Cabezas' counsel identified specific records that Mr. Cabezas believed should have been under his name, but apparently were not. So in response to that, the FBI made an inquiry to the case agent who was responsible for Mr. Cabezas' file, responsible for the investigation records, to ask whether or not there were any records that were not in the file that related to Mr. Cabezas' investigation. He wasn't the only agent who was involved in this case, was he? I'm aware of two—I'm not aware of the agent that was contacted. I'm aware of two agents that were involved in the case, and the agent who was contacted may or may not be the same. The agent who actually corresponded with Mr. Cabezas undercover and was the primary agent for the case was Agent Kaufman, and there's also reference to an agent higher, who I believe was the coordinator of the child exploitation unit. And the question is, once there was reason to believe that the CRS did not contain all responsive documents because the requester gave the Bureau reason to believe that there were other documents, the scope of the ensuing search is not very fully explained. And you've helped me out by saying, well, what they did was they went and tried to find the documents that he'd identified. But my understanding under our precedent is that when there's reason to believe that the search that was conducted was not sufficient to identify, you know, all reasonably available documents, that a further search should be conducted. Or broadly, that there should be, you know, let's contact the people who worked on this case and ask them if they have anything responsive by these same terms or, you know, in some other more categorical description. But my understanding is that that was not done. Well, what was done, Your Honor, and I think it was it was reasonable and well described in the declaration. So we know that the initial search was of the CRS system, and the only documents that there was reason to believe were not in that system were certain specific documents that Mr. Cabezas' counsel identified in the litigation. That was the arrest photos and the two audio recordings. I'm not sure that that's the correct inference. I mean, there were documents that were not included. The information that the requester had was that there were these two categories that he could imagine should be in the file. But, you know, as you know, FOIA is kind of putting your hand into a black bag and not really knowing what you're looking for. And so there is a, you know, the burden shifts then to the government to show, well, in response to this shortfall, we've taken the next step, which is realizing that CRS didn't have everything on this investigation. We've looked in the places generally for information relating to the investigation where other information might be found. It doesn't sound like that step was taken. It's a general look for other information in other places. I think it was general, Your Honor. What the declarations describe is that that individual custodian at the Tampa field office, the inquiry to that individual was are there any records, any records at all that are about Mr. Cabezas that are not included. Point me to the which declaration you're talking about. Yes, Your Honor. I'm talking about, I believe it's the third side declaration. And this is on page. J. A. 649. Targeted search of the Tampa field office. Contacted special agent. Requested a search for any additional documents. The S. I. Maintained outside the case file. That's right. Any additional documents, any additional documents that fill in the blank. That were not in the case file. Like, he's got a whole filing cabinet, but so the nexus to this case is not explained. Well, Your Honor, I think, you know, typically there's some some further description of the search. Sure. Well, I have to review it. Yeah, I think there's adequate understood. Your Honor. I think there's two different types of searches that you see perform. Sometimes there's sort of centralized search, which is the search that the FBI initially performed here of a broad system that employed search terms and employed going through hits to determine whether or not they responsive. And you often see in these cases, a more targeted search in which individual custodians of records are contacted and asked to retrieve any documents that are responsive to the request. And, you know, there can be, you know, dozens, hundreds of custodians in any individual case, and you don't necessarily describe each and every folder that that individual clicked on. What you say is you inquire of the custodian. We understand you're the custodian of this type of records. Please provide anything that's responsive to the request. And that's that's what occurred here. But the question is, if somebody who is the custodian, you know that typically we have from you declarations that would say, you know, CRS is the main repository, everything's forwarded to it. Occasionally, some things aren't forwarded to it in that event. You know, it would be for it would have been forwarded from the agents involved in the investigation to the custodian of records in the field office. You know, we confirmed that that was done here and therefore contacted only the custodian of records or, you know, some records weren't forwarded and therefore we contacted all the agents who are in the investigation and asked them to search in their hard copy files and on their desktops. I mean, there's nothing like that. It sort of tells us what was the targeting? Why was this person chosen? Are we finding it reliable that this person is a custodian of all the records? Where did he find the things that he did produce? Did he call up the other agents or were they on his desk or were they in a file label? So we don't really, as a court, have the usual indicia that we are able to rely on in the unusual FOIA context where we rely on the government's affidavits. Your Honor, I think you start from the position that the CRS generally contains all of the FBI's investigatory records. So everything would reasonably be expected to be located there. And our declaration, the Second Sidell Declaration, explains in some detail why that is so. That is the system that the FBI uses to respond to FOIA requests. It's also the system that the FBI uses to carry out its core law enforcement function. This is how the FBI retrieves the records that are central to its mission. So you start with that assumption. All the records are going to be contained within the CRS. And then during the course of litigation, counsel points out a limited set of records that appear to have been overlooked or that weren't in the CRS. You might say that arguably they're not responsive to Mr. Cabezas' request because they're not under his name. But the FBI contacted, and it explains the individual that it contacted. It contacted someone who maintains plaintiff's criminal case file, the person who maintains the file. That's the custodian. And they were contacted because they maintain that file. They were asked to search for any additional documents that that agent maintained outside of the case file. And they found precisely the two documents, the two categories of documents that Mr. Cabezas indicated as having been overlooked. So I think that cures. I think even Mr. Cabezas has said that that specific ability to locate those overlooked records cured at least that objection, that aspect of the FBI search. Your Honor, I just want to address, you were discussing with opposing counsel his contention that the FBI redacted his own name from certain records. As Your Honor pointed out, the case numbers are different on those records. Mr. Seidel also addressed that allegation in a declaration and said so very explicitly that the FBI, quote, did not withhold plaintiff's own name within the records. That is at JA-658. That is not Mr. Cabezas' name. It's not any variation of his name. It's not any misspelling of its name. It's a completely different name. And so it is properly withheld. I want to address briefly also the backdating allegations. This is based on two different versions of an NCIC report that is in the record. Now, those two different versions are different in many ways. One is. Before you move on, I'm just thinking about this question of the supplemental search. I think that Mr. Horowitz had also, or maybe it was Cabezas at the time, had also identified it was some kind of a log. And that wasn't actually. That was identified in the reply brief, Your Honor. It was not mentioned in the opening brief. But there was so there was the initial the FBI in this case initially claimed a broader exemption 7A exemption because court proceedings were still ongoing. Once those court proceedings resolved in favor of the government, it began processing records for release. Now, that I think it was a 1087. FD-1087 was mentioned on a Vaughn index in connection with that earlier 7A withholding. It is not mentioned in the current Vaughn index, and that is because it has been released to Mr. Cabezas. It is in the joint appendix at JA-464. If you look in the top left-hand corner of that document, FD-1087, Federal Bureau of Investigation collection item log. So that accounts for that. 464, Your Honor. JA-464? Yes, Your Honor. So that is the FD-1087. And the ensuing pages? I believe it's just one page. Oh, no, yes, the ensuing, the one ensuing page, I believe. No. Oh, yes, that's a 302, correct? Yeah. Yes. That's correct. Okay. That's helpful. Thanks. Sure. On the Vaughn index, there's a description of records, Bates numbers 167 to 216. The Vaughn index refers to them as undated photographs, but the FBI declarations describe them as undercover communications. So these are screenshots of undercover communications with Cabezas? So that's why they're in one place described as photographs and another place described as communications? I don't want to reveal more information than the FBI has put into the declarations and get into some law enforcement sensitive information, but I will confirm, Your Honor, that they are both photographs and communications. They're both photographs? Yes, they are both of those things at the same time. They meet both definitions. That's correct, Your Honor. And they are withheld as under Exemption 70. And so in the FBI's declarations, those text messages have already been released? The text messages with Mr. Cabezas that the FBI maintained on its own side that it had full chain of custody for, those have been released, as well as all of the communications. My friend was referring to communications through Craigslist. Those emails have been released. And he wanted the agent side phone? I think he indicates that the agent, I mean, everything from the agent side that was the communications with Mr. Cabezas from the agent side have been released. They were part of the investigation file and they were released in full, or at least with minor 7C redactions. My understanding of the agent phone is that's his contention that an IP address linked up to a T-Mobile ISP. We think it's a total non sequitur to get from that to the conclusion that somehow the device that was used to use the T-Mobile ISP service was not covertly purchased or that it was a home computer. It's a total non sequitur, and I don't think it has anything to do with whether or not the FBI processed this FOIA request in good faith and released the information. Like I said, the communications from the FBI with Mr. Cabezas, both the Craigslist emails and the text messages were released. Does the court have any further questions? Judge Rogers? Thank you. Please affirm the district court. I'm back. I would just briefly, and I thank you for the extra two minutes. I won't use all of it. Briefly just point to the idea, and your honors have raised it very recently. The agent that was the custodian of records in this case gave additional records that were not contained in the CRS report. I don't think we have an affidavit from that underlying agent saying that they have produced everything and that they were able to get everything. It's more of a secondary declaration. Confirming what he was told or what the reports show? No. Confirming that all of the records that that custodian himself in Tampa actually had that were responsive had been produced. Right, because the Seidel. Third Seidel declaration. Anyway, you don't need to worry about it. We'll just look it up. Well, you're arguing that Seidel can't testify to hearsay in his declaration. Exactly. He doesn't have personal knowledge of the records in Tampa. He's not in Tampa. But we almost never in FOIA cases get firsthand declarations from the people who actually conduct the search. We get secondhand declarations from someone who, you know, oversaw the search. I suppose that makes sense, especially when things are kept in a centralized location. I think the concern, it's always been my client's concern is that the things weren't kept in a centralized location. So, the idea that the person who's overseeing the search can testify what their procedures are for keeping the records and can testify about the scope of their search and who they talk to. But when you've discovered specific records that were outside of where they should have been, and they were held by some other custodian, I don't know how they can testify and, you know. What's your best case on that? Say that again? Oh, I don't have a... I mean, that was the implication of Judge Wilkins' question. Yeah, I mean, it's hearsay. It's just evidentiary. And I'm saying, what's your best case? I don't have a hearsay case in front of me on this particular issue. I could, I could wrap the letter for you, but I don't have it. But you do have a citation? A case citation? With respect to, no, that, this is, I don't, I don't have it with me. All right, thank you. And so, the things you had identified that were, that led you to believe that the materials that you got from the supplemental search were inadequate, you said, were the phone and the potential personal computer? Yes, the IP address, T-Mobile IP address, and the fact, computer, and the fact that these, at least one of the two agents involved had previously been reprimanded for doing exactly what we think happened here. Did you ever argue in the district court that the third Seidel declaration, at least to the extent that there were paragraphs that talked about what subsequent search was done in Tampa, that that declaration should be stricken because it's hearsay? I don't think I made that argument. All right. Thank you so much, Mr. Horowitz. Thank you. Mr. Walker, the case is submitted.
judges: Pillard, Wilkins, Rogers